**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MARCIA MEIS, in her official capacity as the Director of the Administrative Office of the Illinois Courts,<br><br>Defendant. | Case No: 26-cv-14530<br><br>Judge:<br><br>Magistrate: |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Courthouse News Service ("Courthouse News") alleges the following in support of its Complaint for Injunctive and Declaratory Relief against Marcia Meis, in her official capacity as the Director of the Administrative Office of the Illinois Courts ("Director"):

**INTRODUCTION**

1. The First Amendment to the United States Constitution provides the press and public with a qualified right of access to civil complaints. For new electronically filed (e-filed) civil complaints, the First Amendment right of access attaches when the complaint is submitted by the filer and received by the court. Policies and practices that delay access to new complaints following their receipt by the court must be scrutinized under the appropriate constitutional test to determine whether they violate the First Amendment.

2. Nine years ago, Courthouse News brought a First Amendment action in this Court challenging the Cook County Circuit Court's policy and practice of withholding access to new civil complaints e-filed with the Cook County Circuit Court until after court staff completed

administrative processing, which regularly took at least one day and often longer. At the time, only a few circuit courts in Illinois allowed e-filing. Cook County was one of them, and it provided e-filing through a local system under its control. Courthouse News sought a preliminary injunction prohibiting Cook County from withholding access to new civil complaints until after administrative processing, which Judge Kennelly granted after finding the clerk was not likely to carry her burden of justifying the access restriction under constitutional scrutiny.

3. On appeal, the Seventh Circuit dismissed the case on abstention grounds. Citing "general principles of federalism, comity and equity," the Seventh Circuit concluded Courthouse News' claim "should be heard first in the state courts" as "[t]he claims here are not suitable for resolution in federal court at this time," "at least before the state courts have had a chance to consider the constitutional issue." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1074-1075 (7th Cir. 2018).[1]

4. Much has changed since *Brown*. The Illinois circuit courts no longer provide and control their own local e-filing systems. Instead, all e-filed documents throughout the state are received into a central e-filing system administered and controlled at the state level by the Administrative Office of Illinois Courts ("AOIC"). The AOIC provides statewide e-filing using the same third-party platform used by numerous other state courts across the nation.

5. When the AOIC implemented the new statewide e-filing system it could have done so in a manner that avoided delays in access to new e-filed complaints by making them available to the press and public as they are received by the court. Unfortunately, the AOIC

---

[1] Courthouse News respectfully submits that *Brown* was incorrectly decided and relied on fundamentally flawed reasoning. Among other things, its requirement that federal review take place following state court adjudication failed to account for the preclusive effect of any state court judgment on Courthouse News' claim.

instead configured the new system to keep newly filed complaints inaccessible to the public until busy clerks are able to process them.

6. Consequently, new complaints e-filed throughout Illinois are regularly withheld from the public until at least the day after they are filed – and often longer. Delays vary significantly from court to court, and from month to month, with no predictability as to when a particular complaint will become available. The delays in access prevent Courthouse News from reporting on new e-filed civil complaints when they are filed, which is when they are most newsworthy. *See Courthouse News Serv. v. Omundson*, 190 F.4th 757, 766-767 (9th Cir. 2026) ("The core public interest that the First Amendment right of public access protects includes obtaining contemporaneous news.") (quotations and citations omitted).

7. E-filing courts throughout the country increasingly have been taking advantage of technical solutions to provide access to e-filed complaints when the court receives them rather than withholding them from the public until after the completion of administrative processing. Currently, a large and growing number of courts across the nation provide such on-receipt access to new e-filed civil complaints, regardless of whether court staff have completed administrative processing.

8. Despite the availability of proven solutions that provide public access to new e-filed complaints without delay, the AOIC insists on maintaining the current configuration of the statewide e-filing system that withholds public access until after clerk processing. As a result, delays in access to new civil complaints are ongoing and pervasive in Illinois circuit courts.

9. The AOIC exercises exclusive control over the statewide e-filing system, including the manner in which it is configured relative to press and public access to newly filed

civil complaints. Individual circuit court clerks lack the authority or ability to make changes to the statewide e-filing system.

10. To address the problem of delayed access to new e-filed civil complaints, Courthouse News engaged the AOIC in December 2025. Courthouse News met and communicated with the AOIC over the next seven months, explaining how withholding access until after processing produces ongoing and systemic access delays, and requesting implementation of one of the proven access solutions used by other state e-filing courts. The AOIC rejected the request and instead suggested it could encourage clerks to process complaints more quickly. However, in Courthouse News' experience, asking court staff to work faster does not solve the problem. This can be for any number of different reasons, including insufficient staffing, filings submitted after clerks go home for the day, or busy clerks not being able to tend to new filings.

11. The AOIC continues to withhold access to new e-filed civil complaints until after processing, and pervasive delays in access continue.

12. The access delays caused by the AOIC's policy of withholding access until after processing have injured Courthouse News and will continue to do so while that policy remains in place. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *accord Cassell v. Snyders*, 990 F.3d 539, 545-46 (7th Cir. 2021).

13. Courthouse News now brings this action under 42 U.S.C. § 1983 to protect its First Amendment rights.

## JURISDICTION AND VENUE

14. Courthouse News' claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, Title 42 U.S.C. § 1983, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 and 2202 (declaratory relief and further relief). The Director is subject to personal jurisdiction in this District.

15. Venue is proper in this District under 28 U.S.C. § 1391(b) because the AOIC maintains an office in Chicago, and because a substantial part of the events or omissions giving rise to Courthouse News' claims occurred in this District. Specifically, the AOIC maintains a statewide policy and practice that results in delayed access to new e-filed civil complaints across each of the Illinois circuit courts. The circuit courts for the 5 most populous counties in Illinois (Cook, DuPage, Lake, Will, and Kane), and which receive the majority of civil complaints filed across the state, are located within this District.

## PARTIES

16. ***Courthouse News*** is a nationwide news service founded more than 35 years ago to report news about civil litigation. Courthouse News now employs approximately 236 people, most of whom are editors and reporters, covering state and federal trial and appellate courts in all 50 states in the United States.

17. Courthouse News offers its readers a variety of publications. Its New Litigation Reports contain original, staff-written summaries of significant new civil lawsuits and are sent to subscribers via e-mail each evening. Among Courthouse News' other publications is the *Daily Brief*, which covers published, nationwide appellate rulings, including all U.S. Supreme Court

and federal circuit decisions, decisions from state appellate courts, and significant rulings from the federal district courts.

18. Courthouse News also publishes a freely available website (www.courthousenews.com), which features news reports and commentary and is read by roughly 45,000 people every weekday. The website functions much like a print daily newspaper, featuring staff-written articles from across the nation that are posted throughout each day and rotated on and off the page on a 24-hour news cycle. On November 18, 2026, for example, the news page carried staff-written stories about a lawsuit by LeBron James against an AI sports betting app, a federal court decision interrupting the sale of the nation's first deep-sea mining leases based on the Endangered Species Act, and a Fourth Circuit decision holding prediction markets like Kalshi subject to state gambling laws.

19. Courthouse News' more than 2,200 subscribers nationwide include law firms, law schools, government offices, and news outlets. Many of Courthouse News' subscribers have dozens or even hundreds of readers within them.

20. Courthouse News functions as a pool reporter for news about civil litigation. Its many media subscribers include the Associated Press, *The Atlanta Journal Constitution*, *The Boston Globe*, *The Dallas Morning News*, *Fox Corporation, LA Times, NBC News Digital,* The Walt Disney Company, and *The Washington Post*. Courthouse News' reporting is frequently credited as the source for news stories by a wide variety of outlets, including *The New York Times*, *The Wall Street Journal*, *New York Magazine*, *U.S. News and World Report*, ABC News, Fox News, Politico, NPR, the *Courier Journal*, and the *Chicago Sun-Times*.

21. Subscribing educational institutions include Southern Illinois University, Baylor College, Boston College Law Library, Columbia Journalism Investigations, Stanford University,

University of Chicago Booth School of Business, University of Maryland, University of North Carolina at Chapel Hill, and University of Pennsylvania Law School. Government subscribers include the Ohio Attorney General, Peoria City Attorney's Office, and the State Bar of Texas, Office of General Counsel.

22. In Illinois, Courthouse News covers general civil litigation, focusing on actions brought against business institutions and public entities. The *Cook County Report* includes new civil complaints filed with the Cook County Circuit Court (District 1). The *Chicago Regional Report* includes new civil complaints filed with the circuit courts in Cook (Districts 2-6), DeKalb, DuPage, Kane, Kendall, Lake, McHenry, and Will counties.

23. Courthouse News' reporters do not cover family law matters, name changes, probate filings, most mortgage foreclosures, or actions brought only against individuals, unless the individual is famous. Courthouse News does not report on and does not seek to review the small number of new civil complaints that are statutorily confidential or accompanied by a motion to seal.

24. To prepare the New Litigation Reports and identify new cases that warrant additional coverage, Courthouse News' reporters visit their assigned courts either in person or remotely to review the cases filed that day and determine which are of interest to Courthouse News' readers. Courthouse News covers Illinois circuit courts through a combination of in-person and remote daily coverage, prioritizing coverage of new civil complaints filed in Illinois' most populous counties.

25. Given the nature of the coverage in the New Litigation Reports and Courthouse News' other publications, delay in the ability of a reporter to access new complaints holds up Courthouse News' reporting of new controversies for readers.

26. ***Director Meis*** is the Director of AOIC and is named as a defendant in that official capacity. The Director is charged with assisting the Illinois Supreme Court's exercise of its administrative and supervisory authority over all Illinois courts. Ill. Const. art. VI, § 16.

27. The Director is generally responsible for the enforcement of the rules, orders, policies and directives of the Illinois Supreme Court and the chief justice relating to matters of administration. Ill. R. S. Ct. 30(b). The Director is responsible for developing, compiling and promulgating administrative rules and directives relating to case processing, records and management information services, personnel, budgeting and such other matters as the chief justice and Illinois Supreme Court shall direct. *Id.*

28. The AOIC provides support and programming to courts statewide through its offices and divisions, including the Judicial Management Information Services / IT division ("IT Division"). The AOIC and its IT Division oversee and are responsible for the judicial branch's technology initiatives in the circuit courts, including implementing, maintaining, and supporting the statewide e-filing and public access systems.

29. As Director of the AOIC, the Director is responsible for the procurement, implementation, configuration, maintenance, and administration of the statewide e-filing and public access systems used by the Illinois circuit courts, including the manner in which such systems are configured relative to press and public access to new civil complaints.

30. Courthouse News is informed and believes the Director, acting in her official capacity, and others acting under her direction and supervision, are responsible for the delays in access to new complaints experienced by Courthouse News and other members of the press, which acts reflect the official policies and practices of the AOIC.

31. The Director's actions, as alleged in this Complaint, are under the color of Illinois law and constitute state action within the meaning of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

32. The Director is sued in her official capacity only. Courthouse News seeks relief against the Director, as well as her agents, assistants, successors, employees, and all persons acting in concert or cooperation with her or at her direction or under her control.

## FACTUAL ALLEGATIONS

### Historical Access to New Civil Complaints in Illinois and Nationwide

33. When Courthouse News' founder and editor, William Girdner, started covering the U.S. District Court for the Central District of California in the 1980s as a journalist writing news articles for *The Boston Globe* and *The New York Times*, reporters would regularly go to the clerk's office at the end of the day to look over a stack of newly filed civil complaints. The complaints were all filed in paper form, and they were reviewed by journalists before they were processed or docketed by court staff.

34. Throughout the 1990s, Mr. Girdner or the bureau chiefs for Courthouse News visited federal and state courts throughout the country—including courts in Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, Wisconsin—and observed similar traditions of access to newly-filed civil complaints as the complaints crossed the intake counter. Each court had its own method of providing such access—some courts placed newly-filed, unprocessed complaints on carts or in bins or boxes where the press could review them; some courts allowed the reporters to go behind

the counter to review newly-filed complaints; and some courts allowed the press to review the judge's courtesy copy of new civil complaints.

35. Regardless of the particular method used by the courts it visited, Courthouse News found that it was able to access new complaints upon their receipt by the court, regardless of whether the clerk's office had completed the administrative tasks associated with the new complaint's intake. These tasks used to be called docketing but are now often referred to as "processing."

36. This tradition of un-delayed press access to new civil complaints was alive and well when Courthouse News expanded its coverage to Illinois. In 1997, Mr. Girdner visited the Richard J. Daley Center, which houses the main courthouse for the Cook County Circuit Court. He met with Marie Tabata, assistant to then-Clerk Aurelia Pucinski. Ms. Tabata took Mr. Girdner behind the counter into the filing area for the Law Division to show him where reporters reviewed the new complaints, which were all filed in paper form. Reporters from the *Chicago Tribune*, *Chicago Sun-Times,* and *Chicago Daily Law Bulletin* regularly went from the press room into the Law Division and checked the new complaints. Mr. Girdner and reporters from these other publications picked up the new complaints from a tray next to intake clerks before the complaints were docketed and reviewed them at an empty desk nearby. Reporters were allowed to remain in the clerk's office after the filing windows and clerk's office closed for the day, staying as late as a supervisor was present. Similarly, Mr. Girdner checked new complaints filed in the Chancery Division by reviewing the new paper-filed complaints on the day they were filed, behind the counter, before they were docketed. Mr. Girdner then hired a reporter for Courthouse News to cover the Cook County Circuit Court going forward.

37. The quality and completeness of the access to new civil complaints at Cook County Circuit Court as a result of these procedures was excellent, with press review encompassing cases filed that day right up until the time when the clerk's office closed for the day, when new filings stopped, at 4:30 p.m. These procedures ensured that journalists who visited the court every day had access to all of the day's new civil filings.

38. In 1997, Mr. Girdner also visited the Everett M. Dirksen United States Courthouse for the Northern District of Illinois. He met with then-Clerk Michael Dobbins, who took him behind the counter in the filing area and showed him two shallow bins where journalists checked the new complaints and the new rulings. While Mr. Girdner was reviewing the new cases, intake clerks would turn around and place just-filed complaints in the complaints bin. Reporters for City News Bureau, the *Chicago Sun-Times,* and the *Chicago Tribune* worked in the court's press room and checked the new actions and rulings on a daily basis. Courthouse News then hired a reporter to cover the Northern District of Illinois on a daily basis.

39. This same basic procedure has been carried forward into the present e-filing environment in most federal district courts, including the Northern District of Illinois. The CM/ECF system used by the federal district courts provides public access to new e-filed complaints (and other filings) as they are received by the court. As explained in the CM/ECF FAQs on the U.S. Courts website: "Attorneys filing over the Internet automatically create docket entries, and docket sheets are updated immediately when documents are filed."[2] As a result, in the vast majority of federal district courts, new e-filed complaints can be viewed immediately upon their receipt by the court either online via PACER or via public terminals located at

---

[2] https://www.uscourts.gov/court-records/file-a-case-cm-ecf/faqs-case-management-electronic-case-files-cm-ecf

courthouses. No matter what time of day or day of the week, new civil complaints filed in the Northern District of Illinois and most other district courts are available for review immediately upon receipt by the court, regardless of whether court staff have begun or completed any clerical processing.

40. Unlike the federal courts, which preserved on-receipt access to new civil complaints when implementing e-filing through CM/ECF, the Illinois circuit courts introduced delays in access when implementing e-filing, initially through implementation of local e-filing systems in the circuit courts and then later through implementation of the statewide e-filing system in place today.

**Introduction of Electronic Filing in the Illinois Circuit Courts**

41. E-filing was first approved in Illinois on September 19, 2002, when the Illinois Supreme Court authorized electronic filing of documents in select civil cases in circuit courts on a pilot basis. The e-filing pilot project took effect January 1, 2003, and included five sites: Cook, DuPage, Madison, St. Clair, and Will counties.

42. Each circuit court participating in the pilot program was allowed to procure or develop its own local e-filing system and timeline for implementing e-filing. For instance, Cook County implemented an e-filing system developed by an outside vendor called On-Line Information Services, Inc. (OLIS), with e-filing taking effect for civil case types on a voluntary basis in May 2009. In DuPage County, the circuit court implemented an e-filing system called i2File developed by Conscisys Corporation, with voluntary e-filing first becoming available in 2004. Madison County procured an e-filing system from a different company and began accepting e-filed documents in 2009.

43. To encourage the expansion of e-filing, in October 2012, the Illinois Supreme Court concluded the e-filing pilot program and opened the door for all circuit courts to implement their own e-filing systems and initiate e-filing in civil case types.

44. On January 22, 2016, the Supreme Court of Illinois issued an administrative order mandating e-filing of civil cases in all Illinois circuit courts effective January 1, 2018.

***Courthouse News Service v. Brown***

45. As e-filing was about to become mandatory for civil cases in Illinois, Courthouse News brought an action against the Cook County Circuit Court clerk Dorothy Brown, in her official capacity, challenging her office's practice of restricting access to new e-filed civil complaints until after completion of clerk processing.

46. Filed in the U.S. District Court for the Northern District of Illinois on November 2, 2017, Courthouse News' complaint alleged that Cook County's no-access-before-processing policy caused ongoing and pervasive delays in access to new e-filed civil complaints. Courthouse News sought a declaration that this practice and the resulting access delays violated its First Amendment right of access, and an injunction prohibiting that practice.

47. On January 8, 2018, the district court issued a preliminary injunction against the challenged policy, concluding that Cook County's policy of withholding e-filed complaints until after administrative processing likely violated Courthouse News' First Amendment right of timely access. *Courthouse News Serv. v. Brown*, 2018 WL 318485, at *6 (N.D. Ill. Jan. 8, 2018); *see also Courthouse News Serv. v. Brown*, 2018 WL 835220, at *3 (N.D. Ill. Feb. 13, 2018) ("[O]ne might think that a mechanism for compliance with the public's right of access to judicial proceedings is a necessary component of an appropriate e-filing system … and not some sort of a frill, as Brown's argument seems to suggest.").

48. The Cook County clerk appealed the district court's order granting the preliminary injunction, and in an opinion dated November 18, 2018, the Seventh Circuit dismissed the lawsuit on abstention grounds, observing: "[t]he claims here are not suitable for resolution in federal court ***at this time***." *Brown*, 908 F.3d at 1074-75 (emph. added). The Seventh Circuit recognized "[Courthouse News] has not yet sought relief in the state courts here" and that "[p]roceeding straight to the federal court… conflicts with the general principles of federalism, comity, and equity that underlie abstention." *Id.* at 1071. Recognizing the case did not fit into any recognized abstention doctrine, *id.* at 1072-1073, the Seventh Circuit nevertheless dismissed the case, suggesting that Courthouse News' claim could "be heard first in the state courts," *id.* at 1075, with subsequent adjudication in the federal court potentially occurring at a later time. *See id.* ("***Initial*** adjudication of this dispute in the federal court would run contrary to the considerations of equity, comity, and federalism") (emph. added). But an adverse state court judgement would preclude any subsequent adjudication in federal court, denying Courthouse News a federal forum for its Section 1983 claim.

**Illinois' Procurement and Implementation of New Statewide e-Filing and Public Access Systems**

49. While the *Brown* case was pending in the federal courts, the AOIC and Illinois circuit courts were implementing a new statewide e-filing system that would be used by all Illinois circuit courts, replacing the patchwork system of different e-filing systems used by circuit courts at the local level.

50. As of January 2016, only 15 out of 102 Illinois counties had sought and been granted approval to implement a local e-filing system. According to a press release issued by the Supreme Court of Illinois at that time, the limited use of e-filing in Illinois statewide was the likely result of variances in funding and technology resources available to the circuit courts. The

press release explained that in order to address these complications, "the Supreme Court will require e-filing to occur through a single Electronic Filing Manager (EFM), which will be integrated with each court's case management system."[3]

51. The AOIC was responsible for selecting and engaging the vendor that would supply the statewide EFM. In August 2016, the AOIC entered into a contract with e-filing vendor Tyler Technologies ("Tyler") to procure Tyler's eFile & Serve platform (formerly called Odyssey File & Serve), branded as eFileIL, to serve as the centralized statewide e-filing system for use by the Illinois circuit courts.[4] Tyler is a recognized leader in court software, serving numerous state court systems across the nation by providing e-filing, case management and public access software. Currently, Tyler provides its technology solutions to more than 25 different states, including many statewide implementations.

52. According to a press release issued by Tyler on August 9, 2016, the AOIC selected Tyler based on Tyler's "deep expertise and success in statewide e-filing, including similar implementations with e-filing systems in Texas and Indiana." Former AOIC Director, Michael Tardy, was quoted as saying: "We are confident that Tyler has successfully implemented similar approaches in other state jurisdictions, and that Tyler will greatly assist the Illinois judicial branch in moving toward a completely paperless system." Tyler's Odyssey File & Serve platform was already being used in 19 other states at that time.

---

[3] The EFM is the central component of any e-filing system that functions to receive newly submitted documents and route them into a court's case management system. In a statewide e-filing system, the EFM is the central repository that receives newly submitted documents from across the state and routes them into either a statewide case management system (if the state has elected to have one) or into each local court's case management system.

[4] Like other e-filing systems, the central component of Tyler's e-File & Serve system is an EFM that can be configured to operate on a statewide level by receiving newly submitted documents from across a state.

53. At or about the same time the AOIC contracted with Tyler to procure the Odyssey File & Serve platform, the AOIC also contracted with Tyler to procure its re:Search platform, branded as re:SearchIL, to serve as the remote public access system for court filings throughout the state of Illinois. Managed by the AOIC, "re:SearchIL is a web-based platform that allows registered users access to an online repository of court case information powered by the state's e-filing database."[5]

54. On May 30, 2017, the Supreme Court of Illinois amended its administrative order from January 2016 by requiring that circuit courts with local stand-alone e-filing systems migrate from those stand-alone systems to eFileIL by July 1, 2018.

55. The May 30, 2017 administrative order also expressed the "Court's ultimate objective of a statewide online remote access system" using re:SearchIL, which "is designed to serve as an online remote access system similar to Pacer in the federal courts."[6]

56. Of the state's 102 counties, 95 of them began mandatory e-filing through eFileIL effective January 1, 2018. The remaining counties, which already had stand-alone e-filing systems, continued to use those systems pending their eventual transition to eFileIL. DuPage County began using eFileIL on July 1, 2019, while the other courts with stand-alone e-filing systems began using eFileIL on July 1, 2018.

---

5 https://researchil.tylerhost.net/CourtRecordsSearch/Home#!/faq

6 The AOIC has not yet implemented statewide remote public access to circuit court filings. In a press release dated March 27, 2025, the Supreme Court of Illinois announced free remote public access to reviewing-court documents would be available through re:SearchIL effective May 1, 2025. The press release added: "With public access to reviewing court documents now set, the Court will shift focus to statewide public access in the 102 county courts." Free public access to circuit court filings, including new civil complaints, should be available remotely through re:SearchIL once the AOIC completes this initiative.

57. By the end of 2019, all Illinois circuit courts were using eFileIL for civil case filings, including case-initiating civil complaints. The AOIC was responsible for the eFileIL implementation, including selecting and contracting with Tyler, managing and supervising the rollout across all 102 counties, providing financial and technological support, conducting community outreach, and later extending the partnership with Tyler through subsequent multi-year agreements.

58. eFileIL is thus the statewide e-filing platform for the Illinois circuit courts and has been for at least the last seven years, and longer for most circuit courts. The AOIC is the entity responsible for managing and overseeing e-filing throughout the state of Illinois, including maintaining financial responsibility for eFileIL and providing statewide technological and operational support. The AOIC is also responsible for how eFileIL is configured relative to public access to newly filed documents.

59. Despite its ability to configure eFileIL to provide on-receipt access to new e-filed civil complaints, the AOIC configured eFileIL to withhold access until after local court clerks manually process and "accept" them. This practice results in ongoing and pervasive delays in access to new civil complaints e-filed in Illinois circuit courts.

**Alternative Ways of Configuring e-Filing Systems to Provide On-Receipt Access**

60. There are various ways courts across the nation provide on-receipt access to new e-filed complaints and avoid the delays in access caused by withholding complaints until after completion of administrative processing.

61. An e-filed complaint is simply a .pdf document to be viewed or downloaded by whoever has permission. In all e-filing courts, filers prepare and submit their .pdf documents to the court's e-filing manager (EFM). Once received by the court, the .pdf document is either (1)

automatically "accepted" upon receipt and routed from the EFM directly to the court's case management system without any clerk intervention (*i.e.*, an "auto-accept" configuration); or (2) routed to a virtual queue within the EFM where it sits and waits for a clerk to manually "accept" it before being routed into the court's case management system (*i.e.*, a "clerk-accept" configuration)..

62. Courts that use the auto-accept configuration provide on-receipt access as a matter of course because new complaints are automatically routed to the courts' case management and public access systems as they are received. This is how the vast majority of federal courts operate, with new filings automatically accepted through the CM/ECF system and made available to the public through PACER without delay.

63. Even with a clerk-accept configuration, however, access delays are unnecessary. Courts that hold complaints for clerk "acceptance" can allow the press or public to review newly filed complaints while they are sitting in the EFM awaiting clerk processing.

64. Like most other e-filing systems, the File & Serve platform procured and implemented by the AOIC as eFileIL can be configured to operate either way, with new e-filed documents either routed to virtual queues for manual "acceptance" by clerks, or automatically "accepted" by the e-filing system. Courts need not apply the same configuration to all filings and can instead tailor configuration based on the court's needs and preferences. For instance, courts can activate the auto-accept feature for only certain categories of filings, such as non-confidential civil complaints submitted by attorneys (as opposed to *pro se* filers) in select case types (*e.g.*, contract or tort). Complaints that do not meet the criteria for automatic acceptance are routed to virtual queues for clerk review and manual acceptance. The built-in auto-accept feature of eFileIL can be activated or modified at any time.

65. When the AOIC implemented eFileIL, it chose the clerk-accept configuration – i.e., new e-filed documents sit in the EFM until local clerks "accept" them . However, the AOIC did not provide any mechanism for the press or public to review complaints while they sit in the EFM awaiting clerk processing. Instead, new complaints are withheld from the press and public for as long as it takes a local clerk to process and "accept" them.

66. Clerk processing "acceptance" often does not happen until the day after a complaint is filed, and it often takes longer. This is confirmed by a notice the eFileIL system sends to e-filers upon their submission of new complaints, which states: "You will be notified by email in 24-48 hours if your filing has been accepted or rejected." The picture below is an example of this notice that is published online by the AOIC (highlighting added):[7]


no-reply@efilingmail.tylertech.cloud <no-reply@efilingmail.tylertech.cloud>
to OFStestemail@gmail.com
Wed, Mar 22, 12:06 PM

ODYSSEY eFileIL

**Filing Submitted**

Envelope Number: 275582
Case Number: 2022FC000297
Case Name: DEUTSCHE BANK NATIONAL TRUST CO VS JOHNSON, MERCIA, ET AL

The filing below has been submitted to the clerk's office for review and assigned **Envelope Number: 275582**. You will be notified by email in 24-48 hours if your filing has been accepted or rejected

| Filing Details | |
|---|---|
| Court | McHenry County |
| Date/Time Submitted | 3/22/2023 12:05 PM CST |
| Filing Type | EFile |
| Filing Description | |

67. The delays in access that result from courts withholding access to new e-filed complaints until after clerk processing are unnecessary. Other courts can, and do, provide access to new e-filed civil complaints upon their receipt, regardless of whether those courts are configured for auto-acceptance or clerk-acceptance.

---

[7] https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/cc7fe3fb-b1a2-435e-82db-3fbf45dde1c8/Efile_step_11.pdf

68. Courts providing access to e-filed complaints as they are received, regardless of whether staff have completed clerical processing, include the vast majority of federal district courts and state courts in Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Iowa, Kansas, Maryland, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, New York, Ohio, Oregon, Pennsylvania, South Dakota, Texas, Utah, Vermont, and Washington, D.C.

69. Attached as **Exhibit 1** is a document prepared by Courthouse News that identifies state courts that provide on-receipt access to new e-filed civil complaints, including numerous courts using the same Tyler e-filing system procured by the AOIC and used by the Illinois circuit courts. Courthouse News incorporates by reference the information contained in Exhibit 1 as though set forth and alleged fully herein.

70. The document attached as Exhibit 1 includes screenshots depicting some of the many ways courts can configure their e-filing and public access systems to provide on-receipt access to new e-filed civil complaints. For instance, courts can provide access through either secured portals that require registration and a password, or through websites open to the public. Some courts apply watermarks on documents, or post disclaimers on the websites or portals, advising that the displayed documents have not yet been "accepted," that a case number has not yet been assigned, or that the documents have not otherwise been processed.

71. Many of the courts listed in Exhibit 1 initially implemented e-filing systems that withheld access to new civil complaints until after completion of clerk processing, but have since begun providing on-receipt access to new e-filed civil complaints. The state of Missouri, for example, recently began automatically accepting new civil complaints on a statewide basis and

making them available to the public upon receipt, just as most federal courts do.[8] The Iowa courts took a different approach, recently developing and implementing an access portal that displays new e-filed complaints while they sit in the EFM awaiting clerk processing and "acceptance."[9]

72. Each of the courts referenced above and identified in Exhibit 1 processes new civil complaints, but they do not withhold access until that processing is completed. This allows new civil complaints to be read and reported when they are most newsworthy and most capable of commanding public attention.

73. The AOIC could similarly provide access to new e-filed civil complaints as they are received into the eFileIL system, regardless of whether court staff have completed clerical processing. For instance, the AOIC could activate the auto-accept configuration for new civil complaints such that the complaints would be automatically accepted into circuit courts' case management systems and publicly available as they are received. Auto-accept is an existing feature of the e-FileIL system that is currently available to the AOIC at no additional cost through its existing contract with Tyler. Alternatively, the AOIC could develop or acquire a pre-processing access portal (commonly referred to as a "press queue" or "review queue") to display the newly submitted complaints while they sit within the eFileIL EFM awaiting clerk processing and acceptance. To facilitate the development of a pre-processing access portal, the AOIC's e-

---

[8] https://www.courts.mo.gov/page.jsp?id=90277 (a true and correct copy of this webpage as it existed on November 10, 2026, is attached as **Exhibit 2**).

[9] https://www.iowacourts.state.ia.us/ESAWebApp/AlternateFiling (a true and correct copy of this webpage as it existed on November 10, 2026, is attached as **Exhibit 3**). This website can be accessed by first accessing the Iowa Courts Online website at https://www.iowacourts.state.ia.us/ESAWebApp/SelectFrame, and then entering the URL above in the same web browser (either in the same tab or in a new tab).

filing vendor, Tyler, will provide the AOIC with application programming interfaces (APIs) for eFileIL at no additional cost.[10]

74. To date, the AOIC refuses to change its policy of withholding access to new e-filed civil complaints despite the existence of readily available alternatives to that policy. As a result, delays in access to new civil complaints e-filed with Illinois circuit courts are ongoing and pervasive.

**Delays in Access and Courthouse News' Efforts to Resolve Them**

75. According to statistical data from the Illinois Courts, approximately two-thirds of all new civil cases filed in the Illinois circuit courts in the 4th quarter of 2025 were filed in the 5 most populous counties: Cook, DuPage, Kane, Lake, and Will.

76. Based on Courthouse News' tracking, from September 1, 2025, to October 31, 2026, these five circuit courts withheld ***more than half*** (approximately 64%) of e-filed civil complaints until at least one court day after filing. Nearly 14% of these complaints were withheld for two court days or longer. The delays in access to new e-filed civil complaints for each of these five circuit courts during this period are reflected on the following chart:

[*Chart depicted on following page*]

[10] An Application Programming Interface, or API, is a set of rules, protocols, and definitions that allows different software applications to communicate and share data with one another. Using the APIs for eFileIL, the AOIC could develop a webpage or other access portal that displays newly submitted civil complaints while they sit in the EFM awaiting processing, as other courts have done.

| Delays (Measured in Court Days)<br>September 1, 2025 – October 31, 2026 | | | |
|---|---|---|---|
| | **Next Court Day** | **Two Court Days** | **Three or More Court Days** |
| **Cook** | 57.65% | 7.49% | 1.13% |
| **DuPage** | 27.56% | 0.43% | 0.64% |
| **Kane** | 40.24% | 20.60% | 6.44% |
| **Lake** | 25.44% | 24.67% | 27.07% |
| **Will** | 29.68% | 21.84% | 19.81% |
| **Across All Five Courts** | 51.34% | 9.10% | 3.71% |

77. Measuring delays in court days does not account for weekends and holidays, which add to the delay actually experienced by the press and public. The chart depicted in **Exhibit 4** shows the overall delays over the entire period of September 1, 2025, through October 31, 2026, for the complaints tracked in each of these five counties, measured in both calendar days and court days. The charts depicted in **Exhibits 5 – 9** show monthly breakdowns of delays for the complaints tracked by Courthouse News in the five most populous counties for each month from September 2025 to October 2026, measured in both calendar and court days.

78. As reflected in Exhibits 5-9, delays during this period varied significantly from court to court, and from month to month, with no predictability as to when a complaint would become available. For example, in four different months, Cook County withheld ***70% or more*** of new e-filed civil complaints until at least the day after filing. In four different months, Kane County withheld ***more than 70%*** of new e-filed civil complaints until at least the day after filing, with ***more than 35% withheld for two or more court days***. In four different months, Will County withheld ***more than 75%*** of new e-filed civil complaints until at least the day after filing, with

***more than 40% withheld for two or more court days***. And in three different months, Lake County withheld ***more than 80%*** of new e-filed civil complaints until at least the day after filing, with ***more than 70% withheld for two or more court days***.

79. The chart below presents the percentage of e-filed civil complaints that were available on the day of filing in each of Cook, DuPage, Lake, Kane, and Will County Circuit Courts each month from September 2025 through October 2026:

| | **Cook** | **DuPage** | **Lake** | **Kane** | **Will** |
|---|---|---|---|---|---|
| **Sept. 2025** | 36% | 72% | 23% | 16% | 24% |
| **Oct. 2025** | 27% | 63% | 29% | 46% | 19% |
| **Nov. 2025** | 47% | 69% | 32% | 44% | 24% |
| **Dec. 2025** | 48% | 74% | 21% | 41% | 21% |
| **Jan. 2026** | 39% | 74% | 22% | 26% | 21% |
| **Feb. 2026** | 34% | 58% | 20% | 18% | 19% |
| **March 2026** | 38% | 66% | 31% | 14% | 48% |
| **April 2026** | 27% | 51% | 23% | 40% | 27% |
| **May 2026** | 25% | 59% | 18% | 14% | 11% |
| **June 2026** | 30% | 73% | 15% | 28% | 24% |
| **July 2026** | 32% | 61% | 18% | 25% | 49% |
| **August 2026** | 28% | 76% | 18% | 32% | 54% |
| **Sept. 2026** | 35% | 78% | 20% | 56% | 27% |
| **Oct. 2026** | 27% | 69% | 22% | 59% | 24% |

80. The delays in access resulted from the Director's policy and practice of restricting access to new e-filed civil complaints until after completion of clerk processing. Courthouse News is informed and believes that the Director's statewide policy and practice of restricting

access to new e-filed civil complaints results in ongoing and pervasive delays in access throughout the state.

81. The delays in this case are comparable to the delays at issue in other cases where federal courts found no-access-before-processing restrictions unconstitutional, including in *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 547-48 (E.D. Va. 2020), *aff'd*, 2 F.4th 318 (4th Cir. 2021); *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 65 (2d Cir. 2025) (45% delayed a day or more, 23% delayed two or more days); and *Courthouse News Serv. v. Omundson*, Case No. 21-cv-305, 2024 WL 4349112, at *12 (D. Idaho Sept. 30, 2024), *aff'd*, 190 F.4th 757 (9th Cir. 2026) (42% delayed until day after filing, with 15% delayed two calendar days or longer), and longer than those in *Courthouse News Serv. v. Tingling*, Case No. 16-cv-8742, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (rejecting position that "[t]he next business day … is immediate enough" where one-third of complaints were held at least one day).

82. The delays in access resulting from the Director's policy of restricting access to new e-filed civil complaints until after completion of administrative processing prevent Courthouse News from reporting on the new complaints when they are filed, which is when they are most newsworthy.

83. For example, on Thursday, November 12, 2026, at 11:15 a.m., Jacqueline Asise filed an antitrust class action lawsuit against McDonald's USA, LLC and McDonald's Corporation. Cook County Circuit Court staff did not complete administrative processing for this complaint, and it was not available to the public, until November 13, 2026, the day after it had been filed. On Friday, October 9, 2026, at 4:09 p.m., William Kern and Jamie Impastato filed a fraud class against Blue Cross Blue Shield of Illinois. Cook County Circuit Court staff did not complete administrative processing for this complaint, and it was not available to the public,

until Wednesday, October 14, 2026, two court days (and five calendar days) after it had been filed. Courthouse News was not able to include either complaint in the Cook County Reports published on their respective dates of filing.

**Courthouse News Seeks a Resolution from the Illinois Courts**

84. The AOIC does not have a formal procedure or process for members of the press or public to address administrative issues with the Illinois courts, including delayed access to new civil complaints. Accordingly, Courthouse News sought to address the problem of delayed access to new civil complaints filed with the Illinois circuit courts by raising the issue directly with the Director.

85. On December 10, 2025, Courthouse News' counsel, Jonathan Fetterly, wrote a letter to the Director and Chief Justice Hon. P. Scott Neville. The letter identified the problem of delayed access to new e-filed civil complaints, explained how other courts across the nation avoid access delays using alternative practices equally available to the AOIC, and requested the opportunity to meet to further discuss these issues. A true and correct copy of this letter is attached as **Exhibit 10.**

86. On December 12, 2025, John Chatz, Chief of e-Business and Data Strategies with the AOIC, acknowledged receipt of the letter and stated the AOIC was reviewing it and would respond within the next several days.

87. On December 19, 2025, Mr. Chatz and Mr. Fetterly spoke on the phone. Among other things, they agreed to schedule a meeting between Courthouse News and the AOIC for the purpose of discussing the issues raised in Courthouse News' December 10 letter (Exhibit 10).

88. On January 23, 2026, Courthouse News and the AOIC held a virtual meeting in which they further discussed the issues raised in Courthouse News' letter. The attendees of the

meeting for Courthouse News were Mr. Girdner, Adam Angione (Northeast and Midwest Bureau Chief), and outside counsel, Mr. Fetterly and Katherine Keating. Attendees of this meeting for the AOIC were Amy Bowen (Chief of Policy and Government Affairs), Skip Robertson (Chief Information Officer and head of the IT Division), Christopher Bonjean (former Chief Communications Officer), and Mr. Chatz.

89. During the meeting, Courthouse News addressed the delays in access experienced when reporting on new civil complaints e-filed with the Illinois circuit courts, and the ways other courts across the nation avoid access delays by configuring their e-filing systems to provide on-receipt access. The AOIC stated Illinois is not an "auto-accept" state but expressed interest in learning more about the ways other courts have configured their systems to provide undelayed access to complaints while still having clerks accept new complaints before they are assigned an official case number. The meeting adjourned with Courthouse News agreeing to provide that information, including screenshots depicting how other states provide pre-processing access to new e-filed civil complaints.

90. On January 27, 2026, Courthouse News' counsel sent an email to the attendees of the January 23 meeting with a document addressing how other states have configured on-receipt access systems for e-filed civil complaints. A true and correct copy of this email and attached document is attached as **Exhibit 11**.

91. On March 20, 2026, Courthouse News attorneys Mr. Fetterly and Ms. Keating had a follow-up meeting with Mr. Chatz. During that meeting, Mr. Chatz informed Courthouse News' counsel that the AOIC had reviewed everything Courthouse News had sent and that the AOIC was not interested in implementing pre-processing access at this time. Mr. Chatz stated the AOIC had other projects and priorities, suspected the use of different case management systems

could complicate implementation, was not in favor of making updates or changes to the circuit court case management systems, and that costs were part of the consideration. Instead of agreeing to provide pre-processing access, Mr. Chatz suggested the AOIC would consider revising the Illinois Courts' Manual on Recordkeeping to call for local court clerks to process new complaints faster. Courthouse News' attorneys explained why that suggested change would not adequately solve the problem of access delays.

92. On April 28, 2026, Mr. Chatz sent an email to Courthouse News' counsel noting that the Manual on Recordkeeping currently provides that "[t]he Basic Record [for a civil case] should be completely up to date not later than one working day after a document is filed or an event occurs," and suggesting – as he had done during the March 20 call – that the language might be revised to call for rejection or acceptance of new case-initiating filings, "where practical, within the same business day that the filing is received." A true and correct copy of this email is included in the email string attached as **Exhibit 12**.

93. Despite the current guidance calling for the record in a civil case to be "completely up to date not later than one working day after a document is filed," it is not unusual for civil complaints to remain unprocessed – and thus unavailable – two or more court days after filing. There is thus no reason to believe that further changes to the Manual on Recordkeeping would solve Illinois' access-delay problem.

94. On May 7, 2026, Courthouse News' counsel replied to Mr. Chatz's email. Among other things, Courthouse News explained the reasons why, in Courthouse News' experience, prompting local clerks to process new complaints faster typically does not solve the problem of delayed access. The email explained this is especially true in more populous states and counties with larger volumes of filings and can be for any number of reasons, including insufficient

staffing, filings submitted after clerks go home for the day, or clerks deciding it is not practical to process new filings on the day of receipt. The email also addressed the reasons Mr. Chatz previously gave for why the AOIC was not interested in providing pre-processing access at this time. The email requested "that the AOIC reconsider its stance on providing pre-processing access to the limited universe of non-confidential civil complaints at issue here." A true and correct copy of this email is included in the email string attached as **Exhibit 12**.

95. On June 11, 2026, Mr. Chatz replied to the May 7 email by stating, among other things: "[a]t this time, we do not intend to implement a pre-acceptance press queue." A true and correct copy of this email is included in the string attached as **Exhibit 12**.

96. On June 18, 2026, counsel for Courthouse News replied to Mr. Chatz by summarizing the six months of communications between Courthouse News and the AOIC, beginning with the initial letter to the Director and Chief Justice on December 10. The email concluded:

> Courthouse News has been patient but cannot report effectively in the face of these persistent access delays. If the AOIC is unwilling to implement a reliable and permanent solution within three months, Courthouse News will need to resort to a different path to protect its access rights under the First Amendment.

A true and correct copy of this email is included in the email string attached as **Exhibit 12**.

97. As of this filing, Courthouse News has received no further communication from the AOIC, and the AOIC's policy and practice of restricting access to new e-filed complaints until after completion of clerk processing remains in place, along with the resulting delays.

98. By writing directly to the Director, and by engaging with the individuals at the AOIC tasked by the Director to respond on their behalf, Courthouse News sought relief from the highest available level of the Illinois state courts.

99. The AOIC is solely responsible for the administration of the statewide e-filing system, eFileIL, and for configuring it in a way that results in ongoing and pervasive delays in access to new e-filed civil complaints. The circuit court clerks lack the authority or ability to make changes to eFileIL, or to how the press and public access new e-filed civil complaints received by the Illinois circuit courts through eFileIL.

100. Courthouse News informed the Director, and those tasked with answering on her behalf, of the First Amendment problem resulting from the AOIC's current policy of withholding access to new e-filed civil complaints until after the completion of clerk processing.

101. The AOIC has proven unwilling to cease its policy and practice of withholding access to new e-filed civil complaints until after completion of clerk processing despite the demonstrated existence of alternative practices that would allow it to do so.

102. Consequently, delays in access to new e-filed civil complaints continue to be ongoing and pervasive throughout the Illinois circuit courts.

**A First Amendment Right of Access Attaches to Civil Complaints When the Court Receives Them**

103. A right of access grounded in the First Amendment applies to civil complaints.

104. The analysis of a claim alleging a violation of the First Amendment right of access to court documents typically involves a two-step process. The first step is to determine whether, as a general matter, there is a First Amendment right of access to a particular court proceeding or document. If the answer to that question is "yes," the court proceeds to the second step, which is to determine if the restrictions on access to that court process or document satisfy constitutional scrutiny.

105. To answer the question posed by the first step of the analysis, courts in the Seventh Circuit generally apply the *Press-Enterprise II* "experience and logic" test. *Associated*

*Press v. Neal*, 177 F.4th 862, 865 (7th Cir. 2026) (citing *Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*") as setting forth what is now commonly referred to as the "experience and logic" test for First Amendment access to judicial records). To meet this test, a party must establish (1) a historical tradition of accessibility, and (2) a significant positive role for public access in the functioning of the judicial process in question. *Id.*; *accord In re Associated Press*, 162 F.3d 503, 506–07 (7th Cir. 1998) (citing *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)).

106. ***The "Experience" Prong***. The "experience" test under the first prong "does not look to the particular practice of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States." *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993).

107. "There is no dispute that, historically, courts have openly provided the press and general public with access to civil complaints." *Schaefer*, 440 F. Supp. 3d at 557; *accord Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016) ("Complaints have historically been publicly accessible by default ….").

108. A new complaint serves as the opening bell in a legal dispute. In recognition of the media's traditional role as a surrogate observer for the general public as to what is happening in the courts, it has been a long-standing tradition for courts to provide reporters—especially those who visit the courts daily—with access to new civil complaints upon receipt for filing and before administrative processing. This ensures that interested members of the public learn about new cases contemporaneously with their filing, while those cases are most newsworthy and likely to be the subject of public attention and discussion.

109. Historically, reporters covering the courts could review and report on newly filed civil complaints on the day of filing by looking through the new complaints at the courthouse. This access generally occurred upon the court's receipt of a new complaint and before the clerk's office performed the additional administrative tasks that follow the receipt of a new complaint—a process that was traditionally called "docketing" but in recent years, especially as courts have moved to electronic case management systems and e-filing, has been referred to as "processing."

110. In other litigation, Courthouse News has collected and filed evidence showing that, in states where Courthouse News covered the courts in person on a regular basis, there is a history of access to new civil complaints upon receipt regardless of whether court staff have completed clerical processing. This history is found in every region of the United States—north (Michigan, Minnesota, and Wisconsin), south (Alabama, Arkansas, Georgia, Louisiana, Tennessee, Texas, and Virginia), middle (Colorado, Illinois, Nebraska, Ohio, Oklahoma, and Utah), east (Connecticut, New Jersey, New York, Pennsylvania, and Vermont) and west (Alaska, Arizona, California, Hawaii, Nevada, Oregon, and Washington). This evidence "demonstrat[es] that there is a long history of courts making complaints available to the media and the public soon after they are received"—"rather than after [they are] 'processed'"—"regardless of whether such courts use paper filing or e-filing systems." *Courthouse News Serv. v. Planet*, 2016 WL 4157210, *12-13 (C.D. Cal. May 26, 2016), aff'd in relevant part, rev'd in part on other grounds, 947 F.3d 581 (9th Cir. 2020).

111. ***The "Logic" Prong***. "Logical considerations also support a presumption of public access." *Bernstein*, 814 F.3d at 141. The logic prong considers whether there is a benefit to keeping the documents or proceedings at issue hidden from the public.

112. The First Amendment right of access exists to enable free and informed discussion about governmental affairs, which includes ongoing judicial proceedings. Courthouse News facilitates those important discussions by visiting courts and seeking timely access to newly filed civil complaints in order to report on their contents.

113. The filing of a complaint invokes the authority of the people of the United States, and the American people have a right to know that a plaintiff has invoked their power to resolve a dispute and achieve a personal end. The complaint is the basis for the dispute and plays a significant role throughout all phases of the litigation.

114. Access to the complaint allows the public to supervise the judicial process by allowing the public to know the parties to the dispute, the alleged facts, the issues for trial, and the relief sought. Public access to the complaint also allows the public to understand the activity of the courts, enhances the accountability of the court system, and informs the public of matters of public concern. When a complaint is withheld from the public, it leaves the public unaware that a claim has been leveled and that state power has been invoked.

115. Applying the "experience and logic" test, courts have recognized the existence of a qualified First Amendment right of access that attaches to civil complaints upon their receipt by a court. *See*, *e.g.*, *Courthouse News Serv. v. New Mexico Admin. Off. of Cts*., 53 F.4th 1245, 1265 (10th Cir. 2022) (applying the "experience and logic" test and holding "the First Amendment's right of access to court proceedings and documents extends to newly filed civil complaints."); *Schaefer*, 2 F.4th at 328 ("[B]oth the experience and logic prongs are satisfied here. Accordingly, the press and public enjoy a First Amendment right of access to newly filed civil complaints."); *Courthouse News Serv. v. Planet ("Planet III")*, 947 F.3d 581, 591 (9th Cir.

2020) ("Both sides before us agree that experience and logic support a public right of access to newly filed civil complaints.").

116. With respect to new e-filed civil complaints, courts have consistently held that the qualified First Amendment right of access attaches when the filer submits the document to the court and the court receives it. *See*, *e.g.*, *Omundson*, 190 F.4th at 766-67 ("[T]he First Amendment right of public access to judicial documents attaches at the time that complaints are filed with the court by the litigant, or put differently, at the time that complaints are received by the court."); *Corsones*, 131 F.4th at 66 (there is "a presumptive First Amendment right of access to newly filed complaints, which attaches upon a court's receipt of such complaints"); *New Mexico Admin. Off. of Cts*., 53 F.4th at 1266 (holding that "the right of access attaches when a complaint is submitted to the court").

117. The qualified First Amendment right of access is often referred to as a right to contemporaneous access. *See id.* at 1269 (recognizing the press and public "have an important interest in contemporaneous access to civil complaints") (quoting *Schaefer*, 2 F.4th at 328); *accord In re Associated Press,* 162 F.3d at 506–07 ("once access is found to be appropriate, access ought to be 'immediate and contemporaneous.'") (internal citation omitted).

**Delays in Access to New Civil Complaints Infringe Upon Courthouse News' First Amendment Rights**

118. Turning to the second analytical step of a claim alleging a violation of the First Amendment right of access, after the court determines the right of access attaches to a particular record or proceeding, a presumption of access arises that may be restricted only if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 13-14 (internal citation omitted); *accord Planet III*, 947 F.3d at 596;

*Bernstein*, 814 F.3d at 144; *Schaefer*, 440 F. Supp. 3d at 559-60. The AOIC carries the burden of establishing both prongs of this test.

119. Here, the AOIC's no-access-before-processing policy is neither essential to preserve higher values nor narrowly tailored. This is demonstrated by, among other things, the numerous state and federal courts across the nation that have successfully managed to provide public access to new e-filed civil complaints regardless of whether court staff have completed administrative processing and "accepted" them.

120. The access alternatives available to the AOIC would address the reasons given by the AOIC for why it was not interested in providing on-receipt access to new e-filed civil complaints at this time. *See* ¶ 91, *supra*. For instance, cost considerations could be addressed by simply activating the auto-accept configuration of eFileIL, which is currently available to the AOIC at no additional cost through its existing contract with Tyler. *See* ¶ 73, *supra.* The AOIC's stated concerns about circuit court case management systems are easily avoided because both the auto-accept and press review queue alternatives are implemented and managed at the state level through the statewide EFM controlled by the AOIC. ¶ 61, *supra*. The AOIC could provide pre-processing access without impacting any individual county's case management system. Lastly, the AOIC's reference to other projects and priorities speaks only to the AOIC's willingness to devote resources to address the problem of delayed access, not its capacity to do so. The AOIC never suggested it was unable to solve the delay problem by providing pre-processing access. Nor has it committed to adding the project to the IT Division's pipeline. If the AOIC were motivated to solve the problem, it could do so quickly and easily. *See* ¶ 125, *infra.*

121. Courts across the country employ various means of addressing concerns they may have about providing public access to newly filed complaints that have not yet been "accepted"

by court staff. Some courts apply watermarks to unprocessed complaints, place disclaimers on websites or public portals, or provide access through secured systems requiring registration and credentials. *See* Exhibit 1, at 5-16. These and other alternative approaches demonstrate the ways courts can more narrowly tailor their practices to address their concerns while at the same time protecting the First Amendment right of access to newly filed civil complaints.

122. Numerous federal courts have considered challenges to nearly identical no-access-before-processing policies in other state courts and concluded the defendant administrators or clerks either failed to satisfy their burdens of justifying their policies or were not likely to do so. *See Courthouse News Serv. v. Jackson*, Case No. H-09-1844, 2009 WL 2163609, at *4-5 (S.D. Tex. July 20, 2009) (granting preliminary injunction); *Tingling*, 2016 WL 8505086, at *1 (granting preliminary injunction); *Schaefer*, 440 F. Supp.3d at 562-563 (awarding declaratory judgment after bench trial), aff'd 2 F.4th 318 (2021); *Courthouse News Serv. v. Planet*, Case No. CV 11-8083, 2021 WL 1605216, at *1 (C.D. Cal. Jan. 26, 2021) (entering declaratory judgment and permanent injunction); *Courthouse News Serv. v. Gabel*, Case No. 21-cv-132, 2021 WL 5416650, at *19 (D. Vt. Nov. 19, 2021) (granting permanent injunction), *aff'd in part sub nom. Corsones*, 131 F.4th 59; *Courthouse News Service v. O'Shaughnessy,* 663 F. Supp. 3d 810, 820 (S.D. Ohio Mar. 21, 2023) (granting preliminary injunction); *Omundson*, 2024 WL 4349112, at *12 (granting declaratory judgment and permanent injunction), *aff'd* 190 F.4th 757.

123. Neither Courthouse News nor any clerk has ever needed to take legal action to enforce or seek relief from an injunction entered by a federal court in Courthouse News' favor.

124. Not a single case in which Courthouse News has challenged a no-access-before-processing policy has resulted in any federal oversight or monitoring. The reason for this is

simple: state court clerks and administrators can easily cease no-access-before-processing policies by implementing one of the readily available alternatives used by other courts across the nation to provide on-receipt access. They can activate the auto-accept functionality in their EFM and automatically accept non-confidential civil complaints. Alternatively, they can acquire or develop a press queue that displays new complaints while they are awaiting processing, or they can configure their existing access portals to display pre-processed complaints alongside processed complaints. Once the alternative is implemented, the delays are resolved.

125. Courts that cease their no-access-before-processing policies and implement alternative practices can do so quickly. In Vermont, the state courts began automatically accepting new civil complaints within three weeks of the permanent injunction entered in *Courthouse News Serv. v. Gabel*, 2021 WL 5416650 (D. Vt. Nov. 19, 2021). In New York, the clerk for New York County configured the county's access portal to display pre-processed complaints alongside processed complaints within six weeks of the preliminary injunction entered in *Courthouse News Serv. v. Tingling*, 2016 WL 8505086 (S.D.N.Y. Dec. 16, 2016). Similarly, within three months of a preliminary injunction against Franklin County, Ohio's no-access-before-processing policy in *Courthouse News Serv. v. O'Shaughnessy,* 663 F..Supp.3d 810 (S.D. Ohio Mar. 21, 2023), the clerk modified her public webpage to permit online viewing by the public of newly e-filed, non-confidential, civil filings upon receipt and prior to clerk processing. The state of Florida also resolved a challenge to delays caused by its no-access-before-processing policy by creating a free, registration-based statewide access portal that it launched within 75 days of entering into a settlement agreement.

126. Courthouse News has not needed to enforce the terms of any court order or agreement prohibiting a no-access-before-processing policy, nor has any clerk later asked a court to change the terms of a judgment or agreement.

**COUNT ONE - Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983**

127. Courthouse News incorporates the allegations of Paragraphs 1-126 herein.

128. The Director's actions under color of state law, including without limitation her policy and practice of withholding newly filed civil complaints from the press and public until after administrative processing or her enforcement of such policy, and the resulting delays in access to those complaints, deprive Courthouse News, and by extension its subscribers, of their right of access to public court records secured by the First Amendment to the U.S. Constitution.

129. The qualified First Amendment right to access new civil complaints filed in the Illinois circuit courts arises when those complaints are submitted to the court, and access may be restricted only if the restriction is essential to preserve an overriding government interest and is narrowly tailored to serve that interest. For the Director's policy and practice to survive *Press-Enterprise II*'s two-prong balancing test, the Director "must demonstrate that (1) there is a substantial probability that [an overriding government interest] would be impaired by immediate access; and (2) no reasonable alternatives exist to adequately protect that government interest." *New Mexico Admin. Off. of Cts.*, 53 F.4th at 1270 (*citing Planet III*, 947 F.3d at 596) (internal quotations omitted). The Director cannot satisfy either prong of this test with respect to the policies and practices alleged in this Complaint.

130. Courthouse News has no adequate remedy at law to prevent or redress the Director's unconstitutional actions and will suffer irreparable harm as a result of the Director's violations of Courthouse News' First Amendment rights. Courthouse News is therefore entitled

to a declaratory judgment and permanent injunctive relief to prevent further deprivation of its First Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Courthouse News prays for judgment against the Director as follows:

1. A judgment pursuant to 28 U.S.C. § 2201 declaring that the Director's policies and practices that knowingly effect delays in access to newly e-filed civil complaints in the Illinois circuit courts, including, *inter alia*, her policy and practice of denying access to complaints until after administrative processing, are unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution because these policies and practices constitute an effective denial of timely access to new civil complaints, which are public court records to which the First Amendment right of access applies.

2. A preliminary and permanent injunction against the Director, including her agents, assistants, successors, employees, and all persons acting in concert or cooperation with her, or at her direction or under her control, prohibiting her from continuing her policies and practices that deny Courthouse News timely access to new e-filed civil complaints in the Illinois circuit courts, including, *inter alia*, her policy and practice of denying access to complaints until after administrative processing.

3. An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

4. All other relief the Court deems just and proper.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Steve Trubac*

Steve Trubac
Bryan Cave Leighton Paisner LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
Tel: 312-602-5000
Fax: 312-602-5050
steve.trubac@bclplaw.com

Jonathan G. Fetterly (pro hac forthcoming)
Katherine Keating (pro hac forthcoming)
Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: 415-675-3400
Fax: 415-675-3434
jon.fetterly@bclplaw.com
katherine.keating@bclplaw.com

*Attorneys for Plaintiff, Courthouse News Service*